**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **DANIEL BOYLAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:17-cv-1602-TWP-TAB** |
| | ) | |
| **BALL STATE UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Dan Boylan was told by a department chair, an associate dean, and two deans at Ball State University, that if he would get his Ph.D. (preferably a Ph.D. in Technology, with a cognate in accounting from Purdue University's Krannert School of Business), that we would be hired to a tenure track position in Ball State's Miller College of Business. Boylan obtained the specific Ph.D. Ball State had told him was required to get the tenure track position, only to be told when he actually tried to get the position that he was not qualified. Instead, the position was filled by a woman.

Ball State's promise to Boylan constituted a unilateral contract that Ball State breached when it refused to hire Boylan for the tenure track position it had promised. Moreover, when Boylan complained about what he believed was age and sex discrimination, Ball State retaliated by giving the position that Boylan sought to a woman, which was both discriminatory and retaliatory.

## II. STATEMENT OF GENUINE ISSUES [1,2]

[1] In response to Defendants's Motion for Summary Judgment, and pursuant to L.R. 56(1), Plaintiff focuses on disputed facts that are material to the issues raised at summary judgment. To the extent this matter is ultimately tried to a jury, Plaintiff reserves the right to dispute any and all factual issues as alleged by the Defendant.

[2] Plaintiff conceded that his Age Discrimination in Employment Act claim must be dismissed, and the Court has, in fact, dismissed Count 2 of Plaintiff's Complaint. Therefore, Plaintiff has elected not to address the Defendant's arguments on the merits of the ADEA claim. Likewise, after a careful review of the evidence, and light of the Seventh

**A. <u>STATEMENT OF GENUINE ISSUES WITH RESPECT TO DEFENDANT'S "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE."</u>**

**1. "The Milleer College of Business (MCOB), Ball State's business school, is accredited by the prestigious Association to Advance Collegiate Schools of Business ("AACSB")." (Dft.'s Br., p. 3).[3]**

**<u>Dispute:</u>** The AACSB is a good accreditation, one of the top two, but there are a lot of AACSB schools that are not considered among the top schools in the United States, such as IU Kokomo, and IU East. (Boylan Dep., pp. 65:22-66:3).[4]

**2. "Dr. Athavale, his department chair, encouraged him because an advanced degree would enhance his future employment prospects, though he made no suggestion as to which university program Boylan might go." (Dft.'s Br., p. 5).**

**<u>Dispute:</u>** Dr. Manoj Athevale ("Athavale") repeated and confirmed a promise first made by Dr. Sushil Sharma ("Sharma") in 2012, that if Boylan were to get his Ph.D. in Technology, with a cognate in Accounting, ***from Purdue***, he would be promoted to a tenure track position at Ball State. (Boylan Dep., pp. 36:8-37:3). Athevale, Sharma, and others not only specifically told Boylan to go to Purdue, but told him specifically to get his Ph.D. in technology. (*Id.*, p. 37:4-10). Athevale and Sharma also wrote letters of recognition for Boylan. (*Id.*).

**3. "There was no discussion at all in the December meeting of a tenure track appointment." (Dft.'s Br., p. 7).**

**<u>Dispute:</u>** The December meeting was called specifically to discuss Boylan's appointment. However, in the meeting, Boylan was told he was unqualified for a tenure track position. (Boylan Dep., pp. 25:4-9; 47:19-25).

---

Circuit's strict summary judgment standard, Boylan elects not to pursue his Promissory Estoppel and Equal Pay claims.

[3] Citations to "Dft.'s Br., p. X" refer to the correspondingly-numbered page(s) of the *Defendant's Brief in Support of Motion for Summary Judgment*, Dkt. # 55. Internal citations in Dkt. # 55 have been omitted.

[4] Citations to "Boylan Dep., p. X:Y" refer to the correspondingly-numbered page(s) and line(s) in the *Deposition of Daniel Boylan.*

**4. "Boylan also knows that 'fair employment' practices require universities to conduct searches for candidates." (Dft.'s Br., p. 7).**

**Dispute:** When Boylan applied for a position in Computer Technology in 2016, Dean Richard Seymour emailed Boylan that

> [T]he process involves us getting "permission" to invite candidate(s) to campus, while not inviting others. Hiring practices @ BSU involve many legal guidelines (it's all part of the process). Basically, ***Human Resources has agreed to help us fasttrack*** (sic) ***action on this slot***, but it is still an involved scenario.

(Dft.'s Br., p. 7)(emphasis added). Boylan wrote back saying: "Yes I understand the need for fair employment." (*Id.*).

**5. "Boylan's application did not meet two components of the *minimum* qualifications [for the Accounting positions]. His Ph.D. degree was not in Accounting; it was in Technology. And Purdue was not AACSB accredited." (Dft.'s Br., p. 9).**

**Dispute:** Sharma and Athevale had specifically told Boylan to enroll in Purdue's ***Technology*** Ph.D. program. (Boylan Dep., 37:4-9). Purdue had no Ph.D. program in Accounting. (*Id.*, p. 37:13-18). Everyone who goes to Krannert gets a Ph.D. in Management, and then gets a cognate[5] in a specialty area such as Accounting. (*Id.*, pp. 37:22-38:2). Moreover, while Purdue is not AACSB-accredited, it is accredited by the AAU – the Association of American Universities – which is far more selective than AACSB, and the members of which are considered to be among the best research schools in the world. (*Id.*, p. 71:8-9).

**6. "[O]n August 17, a few days before school started, [Boylan] resigned his position and left Ball State for a position at North Georgia. He didn't just leave. He said at his deposition: 'I quit.'" (Dft.'s Br., p. 10).**

**Dispute:** Boylan had been told by Athevale shortly before August 17 that Ball State had no position for Boylan. (Boylan Dep., p. 32:14-18). Athavale refused to clarify whether he meant

---

[5] A cognate is a subject that is related or connected to another. That is, Accounting is a *cognate* of Management.

that Boylan would not have a tenure track position, or that he would not have an instructor position. (*Id.*, pp. 32:13-33:25).

**B. <u>PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN DISPUTE</u>**

1. By the summer of 2015, Boylan's status with respect to his Ph.D. was "ABD," – All But Disertation. (Boylan Dep., p. 11:12-15).

2. Athavale promised Boylan a tenure track position in the Finance Department, of which Athavale was the Chair. (*Id.*, p. 17:13-18).

3. Boylan's position was not one that was going to be advertised. (*Id.*, p. 19:5-7).

4. Dean Jennifer Bott ("Bott") told Boylan that Ball State had "to do everything [the school] could to retain [him]." (*Id.*, pp. 29:25-30:2).

5. Bott told Boylan

> 'We have to get the budget line item put in place, but we're going to do that. We just have to propose it to the provost so that we can get it in. And we know it's not going to be a problem because of the different methods that we have at our disposal to make sure that you get in, and that is the step method, the hire and then not rehire when somebody does, or an add to staff because of the growth.' And she had mentioned, 'We have plenty of facts for this.'

(*Id.*, p. 30:5-16).

6. Athavale told Boylan that Boylan was "not AACSB." When Boylan mentioned this to Bott, Bott's response was "That's funny. You are AACSB." (*Id.*, p. 31:2-6).

7. Boylan worked as a controller, in charge of accounting, for Lincoln National Corporation, and for Fort Wayne Medical Education. (*Id.*, pp. 38:22-39:2).

8. Boylan was told that "once [he got] the degree" he would get promoted. He was told his income would more than double. (*Id.*, p. 39:18-23).

9. Purdue is accredited by the AAU, which is composed of the best research schools in the United States. (*Id*., p. 71:5-10).

10. In 2015 the Accounting Department advertised a tenure track faculty position for an Assistant/Associate/Full Professor of Accounting. The position was to become available at the start of the next academic year in August, 2016. The vacancy that the Department sought to fill was occasioned by because of retirement of Lucinda Van Alst. (Dft.'s Ex. G, ¶ 14).

11. The minimum qualifications for this position included a doctorate or "ABD" (all but dissertation) in Accounting from an AACSB accredited school. (*Id*., ¶ 10).

12. Meyring determined that Purdue's graduate school of Technology was not AACSB accredited, which was another detail of the required minimum qualifications. (*Id*., ¶ 12).

13. An offer was extended to Tiffany Westfall, and she accepted. Westfall's doctorate work was from the University of Nebraska-Lincoln. Her transcript reflected that she was to receive her degree from the graduate school of Business with specification in Accounting. This met our minimum qualifications. Ms. Westfall also has an undergraduate degree in accounting and since 2006 has been a Certified Public Accountant ("CPA") in Indiana. A C.P.A. certificate was a preferred qualification. (*Id*., ¶¶ 13-14).

Additional facts will be supplied as required.

## III. SUMMARY OF THE ARGUMENT

Ball State entered into a unilateral contract with Boylan, the gist of which was that, if Boylan would obtain his Ph.D., he would be hired for a tenure track teaching position at Ball State's Miller College of Business. Boylan performed the contract, and Ball State refused to provide the promised position. In doing so, Ball State not only breached its contract, it did so under circumstances that resulted in discriminating and retaliating against Boylan on the basis of sex and age.

## IV. ARGUMENT

### A. THE SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Peoples State Bank v. First Sec. Leasing, Inc.*, 2012 U.S. Dist. LEXIS 8491, *6 (S.D. Ind. Jan. 25, 2012)(internal quotations omitted). In ruling on a motion for summary judgment, the court must review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.*, at *6-7.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. The Court's job does not extend to weighing the evidence, determining credibility issues of resolving swearing contests. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). After drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Am. Gen. Life Ins. Co. v. Germaine Tomlinson Ins. Trust*, 2010 U.S. Dist. LEXIS 103730, *9 (S.D. Ind. 2010)(internal citations omitted).

### B. BOYLAN HAS A VALID, ENFORCEABLE UNILATERAL CONTRACT.

#### 1. Boylan had a unilateral contract with Ball State.

"Contracts are formed when parties exchange an offer and acceptance." *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005). "A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Id.*

In *Levandoski*, the plaintiff-appellee operated an automobile towing and storage yard. *Id.*, at 855. The Browns left their van with Levandoski after it was damaged in an accident. *Id.* The

Browns hired defendant-appellant Kelly to represent them in a personal injury action based on the accident. *Id*. In a ***telephone call***,[6] Kelly instructed Levandoski to "hold onto" the van, send Kelly the bill, and said that he (Kelly) would pay Levandoski when the case was over. *Id.* By the time the personal injury lawsuit was over, Levandoski had stored the van for ***four*** years, at a cost of $18,827. *Id.* The Browns claimed the storage bill in their lawsuit, and at trial, the jury awarded the Browns $132,000 in damages. *Id*. Kelly refused to pay the storage bill as promised, and Levandoski sued Kelly. *Id*. Kelly filed a motion for summary judgment, which the trial court denied, and which Kelly appealed, arguing that, as a matter of law, no contract was created. *Id*., at 855-56.

In *Levandoski*, the Court of Appeals held that the evidence created genuine issues of fact as to whether an ***oral*** contract had been created. *Id.*, at 857. Moreover, after discussing whether a conventional, bilateral oral contract had been formed, the Court in *Levandoski* explicitly found that, even if a bilateral contract had not been formed, Levandoski would still be entitled to collect under a theory of ***unilateral*** contract. *Id*., at 861. "A unilateral contract arises without a bargaining process or exchanges of promises by the parties." *Id*., (internal quotations omitted). "Only one party makes an offer (or promise) which invites performance by another, and the performance constitutes both the acceptance of that offer and the consideration." *Id.*

**a. Ball State made Boylan an offer (he couldn't refuse).**

In this case, we have a situation very similar to that in *Levandoski*. Boylan contends that Ball State (through Athavale, Sharma, Sanyal, and Bott) ***promised*** him that, ***if*** he would get his Ph.D.,

[6] Although Levandoski did send Kelly a storage bill on four occasions, there was no written agreement between Kelly and Levandoski.

he would be hired for a tenure track position in Finance. (Dft.'s Br., p. 15; SOGI,[7] ¶ 2; SOAMF,[8] ¶¶ 2, 4; Boylan Dep., pp. 17:13-16; 28:16-19; 36:4-21; 39:14-23). Boylan was specifically told what school to attend and what program to enter. (Boylan Dep., pp. 36:18-37:8). Boylan was also told that once he obtained the Ph.D., his income would double. (SOAMF, ¶ 8).

**b. Boylan provides consideration for the promise, and performs the required action.**

In response to Ball State's promise, Boylan enrolled in Purdue's College of Technology and the Technology, Leadership, and Innovation program. (Boylan Dep., p. 11:12-15). By so doing, Boylan both ***accepted***, and gave ***consideration for***, Ball State's offer. *Levandoski*, 825 N.E.2d at 861.

**c. Athavale, Sharma, Sanyal, and Bott had the actual authority to make to promise.**

Ball State makes a lengthy, implicit argument that Boylan knew all along that Ball State's offer was not really an offer. (Dft.'s Br., pp. 6-8; 16-17). In fact, Boylan says the promise was made to him by the chair of the Finance Department (Athavale), the Associate Dean of the Miller College of Business ("MCOB")(Sharma), and ***two different*** Deans (Sanyal and Bott). (Dft.'s Br., p. 15; Boylan Dep., pp. 17:13-16; 28:16-19; 36:4-21; 39:14-23). Boylan also states that Bott told him

> 'We have to get the budget line item put in place, but ***we're going to do that***. We just have to propose it to the provost so that we can get it in. And we know ***it's not going to be a problem*** because of the different methods that we have at our disposal to make sure that you get in, and that is the step method, the hire and then not rehire when somebody does, or an add to staff because of the growth.' And she had mentioned, ***'We have plenty of facts for this.'***

---

[7] Citations to "SOGI, ¶ X" refer to the correspondingly-numbered paragraph(s) in the *Statement of Genuine Issues with Respect to Defendant's "Statement of Material Facts Not in Dispute,"* Part II(A), above.

[8] Citations to "SOAMF, ¶ X" refer to the correspondingly-numbered paragraph(s) in the *Plaintiff's Statement of Additional Material Facts in Dispute*, Part II(B), above.

(SOAMF, ¶ 5)(emphasis added). Boylan's tenure track position was not going to be advertised. (Boylan Dep., p. 19:5-7). Dean Bott said she would create a position for Boylan. (Dft.'s Br., p. 17; Boylan Dep., p. 21:16-17). Although Boylan "[***understood***] the need for fair employment[,]" he was likewise aware that Human Resources had the ability to "fast track" action on a position for Boylan. (SOGI, ¶ 4). Finally, Sharma told Boylan he would do some "behind the scenes work" to help Boylan get through the application process. (Dft.'s Br., p. 17).

A reasonable juror, hearing this testimony could believe that Athavale, Sharma, and Bott had sufficient influence to circumvent Ball State's usual hiring process to hire Boylan for a tenure track position.

**2. The Statute of Frauds does *not* render Boylan's unilateral contract unenforceable.**

Ball State argues that Boylan's unilateral contract claim is without merit because the Statute of Frauds, Ind. Code 32-21-1-1, prohibits enforcement of "[a]n action involving any agreement that is not to be performed within one (1) year from the making of the agreement." According to Ball State, the promise to hire Boylan to a tenure track position could not be performed for at least three years because it was conditioned on Boylan receiving his Ph.D., which Boylan admits would normally take three years. (Dft.'s Br., p.19).

However, Ball State misunderstands the Statute of Frauds' meaning when it refers to "agreement that is not to be performed within one (1) year from the making of the agreement."

> Where no time is fixed for the performance of a contract; or where it is to be performed by a certain day (the right to perform it sooner not being precluded); or where the performance depends upon a contingency which may or may not happen within a year, the contract is not within § 1 of the statute of frauds.

*Purity Maid Products Co. v. Am. Bank & Tr. Co.*, 14 N.E.2d 755, 758 (Ind. Ct. App. 1938)(*see also Wright Mfg. Corp. v. Scott*, 172 Ind. App. 154, 167; 360 N.E.2d 2, 10 (Ind. Ct. App. 1977)(Where

no time fixed for performance of contract; . . . or where it is to be performed by certain day and right to perform sooner not precluded; or where performance depends on contingency which may or may not happen within a year, the contract is not within of the statute of frauds).

Moreover, the Indiana Supreme Court noted more than 100 years ago that "we have a long line of cases holding, and we have no doubt correctly, that it must ***affirmatively appear by the terms of a contract*** that its stipulations are not to be performed within a year after the time of making such contract, in order to bring it within the provisions of the [Statute of Frauds]." *Hinkle v. Fisher*, 104 Ind. 84, 3 N.E. 624, 626 (Ind. 1885).

Ball State's promise to Boylan had no fixed time for performance. More importantly, Boylan's unilateral contract with Ball State did not "affirmatively appear by [its] terms" that it was ***not*** to be performed within a year. Thus, the Statute of Frauds is wholly inapplicable to Boylan's contract.

**C. BOYLAN WAS SUBJECTED TO DISCRIMINATION AND RETALIATION ON THE BASIS OF SEX.**

Ball State clearly and accurately sets out the requirements Boylan must meet in order to survive summary judgment on his sex discrimination and retaliation claims. (Dft.'s Br., pp. 24-26). Moreover, for summary judgment purposes, Ball State concedes that Boylan can establish the first three prongs of the *McDonnell-Douglas prima facie* case. (*Id*., p. 26). Ball State bases its argument against Boylan's sex discrimination on the theory that Boylan has not identified a similarly-situated female comparator who received preferential treatment, and on the claim that there is no evidence of pretext. Ball State claims Boylan's retaliation claim must fail because Ball State took no adverse action against Boylan.

With respect to both claims, Ball State is wrong.

**1. Boylan's sex discrimination claim.**

In 2015 the Accounting Department advertised a tenure track faculty position for an Assistant/Associate/Full Professor of Accounting. The position was to become available at the start of the next academic year in August, 2016. The vacancy that the Department sought to fill was occasioned by because of retirement of Lucinda Van Alst.

(SOAMF, ¶ 10). The minimum qualifications for this position included a doctorate or "ABD" (all but dissertation) in Accounting from an AACSB accredited school. (*Id.*, ¶ 11). Accounting Department Chair Mark Meyring ("Meyring") determined that Purdue's graduate school of Technology was not AACSB accredited, which was another detail of the required minimum qualifications. (*Id.*, ¶ 12). An offer was extended to Tiffany Westfall, and she accepted. (*Id.*, ¶ 13). Westfall's doctorate work was from the University of Nebraska-Lincoln. (*Id.*). Her transcript reflected that she was to receive her degree from the graduate school of Business with specification in Accounting. (*Id.*). This met Ball State's minimum qualifications. (*Id.*). Ms. Westfall also has an undergraduate degree in accounting and since 2006 has been a Certified Public Accountant ("CPA") in Indiana. (*Id.*). A C.P.A. certificate was a preferred qualification. (*Id.*). Meyring claims that Boylan's degree from Purdue was not in accounting, that Purdue was not an AACSB school, and that Boylan has none of preferred qualifications, and that therefore Westfall was not similarly situated to Boylan. (*Id.*, ¶¶ 10-12).

**a. A reasonable person could determine that Westfall and Boylan were similarly-situated.**

> [T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison? There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination. In other

> words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision.

*Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)(internal quotations and citations omitted). Whether individuals are similarly situated is a factual question for the jury. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

Here, Although Boylan's Ph.D. was not in accounting, Athevale and Sharmahad promised Boylan that if he were to get his Ph.D. in Technology, with a ***cognate*** in Accounting, from Purdue, he would be promoted to a tenure track position at Ball State. (SOGI, ¶ 2). Athevale, Sharma, and others not only specifically told Boylan to go to Purdue, but told him specifically to get his Ph.D. in technology. (*Id*.). Moreover, Purdue had no Ph.D. program in Accounting. (SOGI, ¶ 5). Everyone who goes to Krannert gets a Ph.D. in Management, and then gets a cognate in a specialty area such as Accounting. (*Id*.).

Although Athavale told Boylan that Boylan was "not AACSB," when Boylan mentioned this to Bott, Bott's response was "That's funny. You are AACSB." (SOAMF, ¶ 6). According to Bott, "I always hear that I'm not ACSB because I have an industrial psychology degree from Akron, University of Akron, and that's from the psychology department, but I am ACSB because I published in business journals. You are ACSB. He has no right to say that kind of stuff to you." (Boylan Dep., p. 31:7-13).

While Boylan had never held a CPA, he worked for Lincoln National Corporation at their world headquarters in Fort Wayne, where he was in charge of all of their accounting. (Boylan Dep., pp. 38:22-39:1). And while Purdue is not AACSB-accredited, it is accredited by the AAU – the Association of American Universities – which is far more selective than AACSB, and the members of which are considered to be among the best research schools in the world. (SOGI, ¶ 5).

Based on this evidence, a reasonable juror might infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision.

**b. There is sufficient evidence of pretext to allow a jury to conclude that Ball State's purported reason for hiring Westfall instead of Boylan is false.**

In determining pretext, the Seventh Circuit has stated that "the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman*, 667 F.3d 835 at 852. To meet this burden, Boylan must identify such weaknesses, implausibilities, inconsistencies, or contradictions in Ball State's asserted reason that a reasonable person could find [it] unworthy of credence. *Id*. Such evidence is not lacking here.

While Ball State argues that Boylan was unqualified for the accounting position because Purdue's Krannert School of Business was not AACSB-accredited, Purdue is accredited by the even-more selective and prestigious AAU. (SOGI, ¶ 5). Moreover, Athavale and Sharma, two of the people who made the original promise to Boylan, ***specifically*** recommended that he go to Purdue. (SOGI, ¶¶ 2, 5). Moreover, they specifically recommended that Boylan obtain ***exactly*** the degree he ultimately received from Purdue. (*Id*.). What is more, even though Boylan had done exactly as Athevale and Sharma had recommended, he was told at the December meeting that he was not qualified for a tenure track position, even though Athavale, the Finance Department Chair, had promised Boylan a tenure track position. (SOGI, ¶ 3; SOAMF, ¶ 2).

Athavale told Boylan that Boylan was "not AACSB." When Boylan mentioned this to Bott, Bott's response was "That's funny. You are AACSB." (SOAMF, ¶ 6).

Ball State contends that Westfall "had a preferred qualification – above and beyond the minimum – in that she possessed a CPA certification and had practiced as a CPA in Indiana for the previous ten years." (SOAMF, ¶ 13). However, another preferred qualification for the position was

"full-time teaching experience at the university level." (Dft.'s Ex. G, attached Ex. A). Boylan had been a full-time teacher at Ball State for four years. (Dft.'s Br., p. 3).

Based on this evidence a reasonable juror could find such "weaknesses, implausibilities, inconsistencies, or contradictions in Ball State's asserted reason that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d 835 at 852.

**2. <u>Boylan's Retaliation Claim.</u>**

Ball State concedes that Boylan engaged in protected activity when complained to Human Resources about gender[9] discrimination, but argues that Ball State took no adverse action against him as a result. (Dft.'s Br., p. 29). Ball State bases its argument on Boylan's deposition testimony, in which he listed a number of actions which, admittedly, do not constitute an adverse action, even when considered as a whole. (*Id.*, pp. 30-31). However, Boylan is not an attorney, and his perception of what might constitute "retaliation" is not controlling.

Boylan made his complaint to Human Resources shortly after the December 3, 2015, meeting where he was told he wasn't qualified for a tenure track position. (Boylan Dep., p. 114:8-15). According to Meyring, the offer to Westfall was extended ***after*** the five selected candidates were "approved for interview in December, 2015." ((Dft.'s Ex. G, ¶ 13). It is reasonable to assume that if the interviews were only ***approved*** in December 2015, then the interviews could not have been ***completed*** before December 3, 2015, and the offer to Westfall could not have been made before December 3, 2015.

A reasonable juror could infer that Boylan was denied an interview, and that Westfall was given the position instead of Boylan, in retaliation for Boylen's protected activity.

---

[9] And, originally, age.

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment should be DENIED.

Respectfully submitted,

*s/ Jay Meisenhelder*

Jay Meisenhelder, Atty No. 19996-49
JAY MEISENHELDER EMPLOYMENT
& CIVIL RIGHTS LEGAL SERVICES, P.C.
650 North Girls School Road, Suite B20
Indianapolis, IN 46214
Office Telephone: 317/231-5193
Facsimile Number: 317/982-5463
Email Address: jaym@ecrls.com

## CERTIFICATE OF SERVICE

I certify that on December 12, 2018, the foregoing was filed electronically. Copies will be sent to all counsel of record by operation of the Court's ECF/CM system.

*s/ Jay Meisenhelder*
Jay Meisenhelder